UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

IN RE:

| | | |
|---|---|---|
| THE PROGRESSIVE CORPORATION | ) | MDL Docket No. 1519 |
| INSURANCE UNDERWRITING | ) | Consolidated Cases: |
| AND RATING PRACTICES LITIGATION | ) | No.: 1:00-210; No. 5:02-2384; |
| | | No.: 3:01-1465; No. 3:02-2552; |
| | | and No. 3:03-1176. |
| | | Judge: Maurice Paul |

**UNOPPOSED MOTION OF CONSOLIDATED PLAINTIFFS FOR
ORDER APPROVING AND ADOPTING SETTLEMENT,
DISMISSING THE CONSOLIDATED CASES WITH PREJUDICE, AND
DIRECTING ENTRY OF FINAL JUDGMENT,
AND INCORPORATED MEMORANDUM OF LAW**

Consolidated Plaintiffs (hereinafter "Plaintiffs") move this Honorable Court for an order of final approval of the settlement and class certification, preliminarily approved on July 28, 2004, and on August 16, 2004, and for entry of final judgment herein on all consolidated cases. As grounds therefor, Plaintiffs submit the following memorandum of law.

**MEMORANDUM OF LAW**

**I.      INTRODUCTION**

Plaintiffs ask this Court to approve a settlement reached by the parties after several months of arms-length negotiation between opposing counsel highly experienced in complex litigation; a settlement which provides to Class members relief which in large part restores

to them the rights and relief to which they would have been entitled under applicable law as set forth in the Amended Complaint, together with improvements in Defendants' statutory compliance procedures. The Court has previously considered and granted Plaintiffs' motion for preliminary approval of the Settlement. (MDL Doc. 47 & 52)[1]  The notice procedures have been implemented as directed by this Court, and the final hearing is scheduled for October 29, 2004.  With over ten million class members eligible for benefits under the settlement, only 16[2] individuals have objected to the negotiated terms, a vote of overwhelming confidence in the fairness and adequacy of the Settlement by the Class members themselves. Five separate lawsuits are consolidated herein, and the Settlement achieves final resolution of all five cases.

It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 585 (1910).  In this jurisdiction, as elsewhere: "[t]here is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Cotton v. Hilton*, 559 F.2d 1326, 1331 (5th Cir. 1977). In considering final approval of the Settlement herein, "the clear policy in favor of encouraging settlements must ... be taken into account, particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals."  *Patterson v. Newspaper &*

---

[1]     *Consolidated Plaintiffs v. Consolidated Defendants*, 1:03-cv-1519 (N.D. Fla., Gainesville Div.)

[2]Eugenia Fiala and Jeanine Schweinberg withdrew their objections.

*Mail Deliverers' Union*, 514 F.2d 767, 771 (2nd Cir. 1975). Thus, a class action settlement should be approved as long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

## II.   THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE

In the Eleventh Circuit, there are seven factors a court should consider when evaluating a class action settlement: (A) the likelihood of success at trial and potential recovery; (B) the complexity, expense and duration of litigation; (C) the terms of the settlement; (D) the procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views; (E) the judgment of experienced counsel for the plaintiff class; (F) the substance and amount of opposition to the settlement; and (G) the stage of the proceedings at which the settlement was achieved. *Elkins v. Equitable Life Ins. Co.*, 1998 WL 133741 *25 (M.D. Fla. 1998), citing *Warren v. City of Tampa,* 693 F. Supp. 1051, 1055 (M.D. Fla. 1988)*; In re Corrugated Container Antitrust Litigation*, 643 F. 2d 195, 212 (5th Circuit 1981). In the end, a determination of the fairness of a class action settlement is left to the sound discretion of the trial court. *Bennett, supra* at 986.

### A.   The Likelihood of Success at Trial and Potential Recovery

A court does not try a case on the merits when evaluating a settlement. *Cotton, supra* at 1330; *In re Corrugated Container, supra* at 212. The Court should limit its inquiry to whether the benefits of the settlement outweigh the possible risks and rewards of continued litigation. *Elkins, supra* at * 25. "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of

a power to compromise.  This is a recognition of the policy of the law generally to encourage settlements.  This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *In re Corrugated Container* at 212, quoting *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960).   Instead, the Court should rely upon the judgment of experienced counsel and "should be hesitant to substitute its own judgment for that of counsel." *Cotton supra* at 1330.  This is because settlements are compromises, and each provision in the settlement should not be subject to a "hypothetical or speculative measure of what concessions might be gained." *Id*. "Above all, the Court must be mindful that inherent in compromise is a yielding of absolutes and an abandoning of highest hopes" for each side. *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (citations omitted.)

The Docket is replete with evidence that Plaintiffs believe wholeheartedly in the strength of their case.[3]  A full review of the Docket also indicates, however, that the Defendant believes strongly in the strengths of its defenses.[4]  The status of the law as it relates to an insurance company's obligation to provide adverse action notice under the

---

[3]       *e.g.* Plaintiffs' Motion for Summary Judgment (Smith Doc. 59); Plaintiffs' Motion for Class Certification (Smith Docket 113);  Plaintiffs' Renewed Motion for Summary Judgment (Smith Doc. 116).  (Hereinafter "Smith Doc." is a reference to the docket in *Smith v. Progressive*, 1:00-cv-210 (N.D. Fla., Gainesville Div.)

[4]       *e.g.*, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Smith Doc. 65);  Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Smith Doc. 124);  Defendants' Response to Plaintiffs' Renewed Motion for Summary Judgment (Smith Doc. 125);  Defendants' Motion for Summary Judgment (Smith Doc. 125).

FCRA is somewhat unsettled.  There are decisions that are favorable for Plaintiffs. *See Mirabal v. GMAC*, 537 F.2d 871 (7th Cir. 1976); *Braxton v. Farmer's Ins. Group*, 209 F.R.D. 654 (N.D. Ala. 2002)*.*  In Oregon, however, Federal District Court Judge Brown has ruled that the Fair Credit Reporting Act does not apply to new business because there is no "increase in premium."  *Mark v. Valley Ins. Co.*, 275 F.Supp.2d 1307, 1316 (D.Or. 2003). That issue is currently before the Ninth Circuit on appeal. Were Judge Brown's interpretation to be sustained by the appellate courts Plaintiffs' claims against Progressive would be further limited, since discovery herein showed that Progressive only uses credit scores for new business.

Plaintiffs also faced challenges in proving that Progressive's failure to provide an adequate FCRA notice was willful, as required for an award of statutory damages.  There are varying standards for defining the term "willful."  As evidenced by the record before this Court, whether Progressive's conduct rose to the level of  willfulness was a matter of much debate.   Moreover, the Defendants in this action provided a form of notice to all applicants against whom it took adverse action.  The issue before this Court was whether the notice the Defendants provided to applicants was adequate as a statutory adverse action notice.  (Smith Doc. 1, 59, 116, 125)  In addition to the various challenges Plaintiffs faced in proving that Progressive's conduct was willful, Plaintiffs also faced a potential argument that a class based upon willful conduct could give rise to an annihilative damages defense by Progressive. *See In re TransUnion Corp. Privacy Litigation*, 211 F.R.D. 328 (N.D. Ill. 2002) Discovery revealed that Progressive had never been accused by a consumer of willfully

failing or refusing to provide adequate adverse action notice in violation of the FCRA.

Presently pending before this Court are competing motions for summary judgment filed by Plaintiffs and Defendants and Plaintiffs' Motion for Class Certification. (Smith Doc. 59, 113, 116, 125) "It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing the approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." *Cotton, supra* at 1330 (Citations omitted). Moreover, "compromise is the essence of a settlement." *Id.*

The parties have vigorously litigated this case for four years. The compromise Settlement now before this Court was the result of strenuous arms-length negotiations had between Plaintiffs' counsel, who have considerable experience in prosecuting complex consumer law cases, and Defense counsel, eminently experienced in the defense of complex litigation. Thus the risks and costs inherent in continuing this litigation are substantial.

Conversely, the benefits conferred upon the Class through this Settlement are appreciable as well. The notice provisions of the Fair Credit Reporting Act ("FCRA") are designed to protect consumers from unfair and inaccurate credit reporting. 15 U.S.C. § 1681. *See also Guimond v. TransUnion Credit Info., Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (stating that "FCRA was crafted to protect consumers from the transmission of inaccurate information about them."). The purpose behind the adverse action notice requirement of FCRA is to provide a consumer with notice of the fact that the consumer may be harmed by inaccurate information in the consumer's credit report. *See* Senate Report No. 91-517

6

(1969); *See also*, February 14, 2000 Federal Trade Commission informal opinion ("Section 615(a) is designed to require consumer report users to provide consumers with a notice that informs them of what has occurred, and of certain rights they have under FCRA.").

In other words, if a consumer's credit report indicates that the consumer has bad credit and the consumer consequently has to pay more for insurance, FCRA requires that the consumer be so notified by the insurance company. This notice thus provides the consumer an opportunity to contact the credit agency that provided the report, review information in his consumer report, correct any inaccuracies, and prevent further harm from the credit bureau's mistake. At the very least, the consumer will learn that current information in his consumer report is having a negative impact on him.

Here, the proposed Settlement is designed to fulfill the purposes of FCRA. Class members are being informed of adverse action and are being given an opportunity to do something about it. Further, Progressive has agreed to injunctive relief requiring it to change its method for providing FCRA notices. Future consumers will know if they are paying more for insurance from Progressive because of information in their credit report, thus enabling consumers to contact the credit agency that provided the reports, and discover any potential inaccuracies in the offending report.

Plaintiffs learned during discovery that credit reporting agencies are continually updating credit reports and do not keep records of outdated credit information. Thus, the Class and Progressive are unable simply to go back in time and determine whether there were inaccuracies in the credit reports at the time Progressive used the credit reports at issue in this

case, which in some instances was several years ago.  As a surrogate for that lost remedy, however, the parties have agreed that all Class members will now be provided with the opportunity to receive a current credit report.  If there are inaccuracies in that report, consumers will learn of them and can take steps to correct them.

Further, current policyholders who discover inaccuracies in their credit reports can obtain adjustments to their premiums when the inaccuracies are corrected, and may receive a premium reduction going forward.  Given that it is a near impossibility to go back in time to determine the accuracy of a credit report from several years ago, this surrogate relief comes as close to meeting the purposes of the Fair Credit Reporting Act as can reasonably and practically be done.  Given these factors, adopting the Settlement to serve as a surrogate for effectuating the purposes of the Fair Credit Reporting Act is in the best interests of the Class.

### B.    The Complexity, Expense and Duration of Litigation

Analyzing the complexity of the litigation necessarily overlaps with the balancing test examining the likelihood of success at trial.  Whether the Progressive form "Notice of Underwriting Decisions & Information Practices" complied with the FCRA adverse action notice requirements was heavily disputed in this case.  The original complaint was filed against Progressive in November 2000 alleging that Progressive did not fully comply with its obligations under the adverse action notice provisions of the FCRA.  (Smith Doc. 1). Progressive contended, and continues to contend, that its form endorsement attached to all new policies adequately complies with the requirements of the FCRA.  (Smith Doc. 65)

After full discovery conducted by the parties, including written interrogatories, requests for the production of documents, depositions of each of the Class representatives, depositions of corporate representatives at Defendants' home offices, and depositions of other witnesses, Plaintiffs filed a motion for summary judgement.  (Smith Doc. 59)  Both parties filed affidavits from experts in support of their respective positions.   An extensive hearing was held before the Court, which took the matter under advisement.   (Smith Doc. 80) After further discovery, Plaintiffs filed a renewed motion for summary judgment (Smith Doc. 116) and Progressive cross-filed a motion for summary judgment.   (Smith Doc. 125) Additionally, the *Dikeman* Plaintiffs in the Oregon action[5], consolidated herein, likewise sought and received discovery from Progressive prior to consolidation, including depositions of several Progressive corporate representatives, and production of voluminous documents. The record thus reflects that each side fought zealously for nearly four years on behalf of their respective positions regarding liability under the FCRA.

In addition, Plaintiffs filed a motion for class certification (Smith Doc. 113), which motion was opposed vigorously by Defendants.  (Smith Doc. 124)  After briefing by each side, and a case management conference scheduling hearing dates, the parties entered into settlement discussions which stretched over a ten month period.  On April 16, 2003, the MDL Panel consolidated the FCRA cases against Progressive and transferred the consolidated cases to this Court.  (MDL Doc. 1)  Several proposals and counter-proposals

---

[5]*Dikeman v. Progressive Corp.*, 3:01-cv-1465BR (D. Or., Portland Div.)

9

were made, and the Settlement Agreement filed with the Court is the result of compromises by each side. (MDL Doc. 49) Only after all elements of the Settlement for Class members were reached did the parties then negotiate an agreement regarding attorneys' fees and costs, which matter is presented to the Court by separate motion. (Smiljanich Affidavit ¶ 52, 53) The record is thus clear that this case presents complex issues requiring years of contested litigation. The Settlement results are a fair compromise between ardently opposed parties.

### C.    The Terms of the Settlement

The Settlement herein involves the requirement set forth in the Fair Credit Reporting Act ("FCRA") that if an insurance company uses a consumer report to adversely impact the consumer in setting premiums, it must give notice ("adverse action notice") to the consumer that such a report has been used, the source of the report, and a recitation of the consumer's right to obtain a free copy of the offending report and correct any errors that may have appeared therein. 15 U.S.C. § 1681m. Having done so, the obligations of the insurance company are fulfilled under the FCRA. Plaintiffs have alleged, on behalf of Class members, that Progressive did not comply with this requirement of the FCRA in connection with the form notice attached to all Progressive insurance policies.

The primary purpose of the FCRA is to insure accuracy and fairness in the use of consumer reports. Congress created a "self help" system for consumers to correct inaccuracies in the consumer reporting system, but as the FTC has noted "a critical first step" is the issuance of an adverse action notice informing a consumer that an adverse consequence has resulted from a review of the consumer's credit report. Hendricks Affidavit ¶ 13. Ex. A

10

Since the gravamen of the class complaint is Progressive's failure to give adequate notice to class members that their consumer reports were used to set higher premiums, the principle feature of the settlement reached precisely targets that very problem. Each class member, by virtue of the Settlement reached and the notice to the Class member, has now been provided that which he or she was arguably denied by Progressive's form endorsement to insurance policies, the adequacy of which was the subject of the lawsuit. Receiving a class notice herein, just as receiving an adequate adverse action notice, informs the Class member of valuable information, including the fact that because of the adverse consequence resulting from use of that person's consumer report, access to a free credit report is now available to that person. That is the very obligation owed by Progressive to Class members that Plaintiffs in this action contended was not fulfilled, and that is the precise relief afforded to Class members as a result of the Settlement. Class members, numbering over ten million, have now each been specifically advised that his or her consumer report was used by Progressive adverse to the consumer's interests and that Progressive has made available a free credit report as a result thereof. In addition, if a Class member has a current Progressive policy he or she may be entitled to a reduction in premiums and a partial refund of past premiums if corrections to the report would result in an entitlement to a lower premium. The recalculation of premiums under the Settlement terms will be executed pursuant to Progressive's established underwriting protocols approved by the various state insurance

regulators.[6]  These underwriting protocols were the subject of discovery by Plaintiffs in this action. Arguably, this goes even beyond that to which the Class member may have been entitled under the FCRA, since premium refunds are not contemplated by the Act.  Finally, all Class members, and indeed untold numbers of future Progressive policyholders, will receive the significant benefit of changes to Progressive's new FCRA compliance procedures, effectuated as a result of the lawsuit and this Settlement.

Courts have held that a settlement "will not be rejected solely because it does not provide a complete victory for the plaintiffs."  *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996).  Although courts have approved settlements providing minimal relief to class members, this Settlement arguably provides full relief, and then some, for negligent violations of the FCRA.  Each of the more than 10 million Class members is entitled to receive a free copy of his or her credit report, a benefit totaling $90 million in value to the Class.  Hendricks Affidavit ¶¶ 16, 34, 37; *Camden I Condominium Assoc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991).  The changes to Progressive's procedures add approximately $9 million dollars in additional value.  Hendricks Affidavit ¶ 37.  Progressive has estimated the cost of providing Notice to the Class Members at an additional $7 million (Hendricks' Affidavit ¶ 35, 37) and the Class receives the benefit of Progressive's payment of fees and costs to Class Counsel in an amount not to exceed $4.5 million.  Thus, the value of the relief

---

[6]     Some objectors' counsel incorrectly argue that this recalculation of premiums is at the discretion of Defendants. In fact, Defendants must use the protocols authorized by regulations in each state.

provided to the Class through this negotiated Settlement is in excess of $110.5 million. Hendricks' Affidavit ¶ 37. This total, significant though it is, is a minimum value, and does not even include the amount of money that will be refunded to the Class members or the value of the premium reductions that Class members will receive, as this value cannot be calculated until Class members discover and correct any mistakes identified on the free credit report with which they will be provided.

> **D.    The Procedures Afforded to Notify the Class Members of the Proposed Settlement, and to Allow Them to Present Their Views**

Over 7,100,000 current and former Progressive Policyholders received individual mailed notices informing them of this Settlement and its benefits. Waugh Affidavit ¶ 4 (filed under separate cover) In addition, national advertising of the settlement through USA Today, USA Weekend, Parade and Vista (a Spanish language weekly publication) reached several million more consumers who never obtained a Progressive policy but only received a quote for automobile insurance. Pines Affidavit ¶¶ 6, 7. Through the inclusion of the Notice in these national publications, the Notice reached in excess of 60 million people in two languages. Pines Affidavit ¶¶ 6, 7, 8. Thus, some number well over 10,000,000 people have had the benefits of the settlement made available to them.

In addition to the mailed and published Notices, previously approved by this Court, the Parties made available to all Class members a website through the Claims Administrator containing further information regarding the settlement. Ex. B. The website included frequently asked questions and answers; copies of court documents (including the Notice,

Claim Form, Settlement Agreement, and Order Preliminarily Approving the Settlement); information on how to reach the Claims Administrator and a link to a website maintained exclusively by Class Counsel.  The website provided by Class Counsel contained additional frequently asked questions and answers, an opportunity for Class Members to e-mail Class Counsel with any questions and a toll-free telephone number Class Members could use to call Class Counsel with questions. Ex. C.  Finally, if anyone called Progressive directly with questions about the Settlement Agreement, the Class Members were directed to a toll-free telephone number manned by the Claims Administrator.

The previously reviewed and approved printed Notices fully comply with the requirements of Rule 23(c) as amended December 1, 2003.  The available websites and manned toll-free telephone numbers provided extensive and full information to Class members about the Settlement.  Thus, the Notices, websites and manned toll-free telephone numbers provided full disclosure to the Class members about every significant aspect of the case and literally every aspect of the resulting Settlement Agreement, and provided multiple ways for the Class members to express their views about the Settlement.

### E.  The Judgment of Experienced Counsel for the Plaintiff Class

Class Counsel consists of several attorneys experienced in complex class action litigation and in FCRA liability cases.  "Even in class action contexts, the trial court is entitled to rely upon the judgment of experienced counsel for the parties."  *Elkins, supra* at *28 (citations omitted)

14

James. Hoyer, Newcomer & Smiljanich (hereinafter James Hoyer), has dedicated itself to the representation of consumers.  Counsel at James Hoyer, including the undersigned, Terry Smiljanich, has been co-counsel or lead counsel in several dozen nationwide class actions representing consumers. Ex. D  Terry Smiljanich, court appointed Lead Counsel for this Class is a member of The National Association of Consumer Advocates, a nationally recognized consumer watchdog organization whose mission "is to promote justice for all consumers by maintaining a forum for communication, networking, information sharing among consumer advocates across the country and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair and abusive business practices that adversely affect consumers." *NACA Membership Directory 2003*.  NACA counts among its members: attorneys, including representatives from numerous legal aid organizations; state and local consumer affairs department representatives; assistant attorneys general from various states; representatives of AARP; representatives from the National Consumer Law Center; representatives of various state and local regulatory agencies; and professors from various universities and colleges of law.

The Class members in this case are represented by a number of other experienced and highly qualified counsel as well, likewise dedicated to the representation of consumers.  The counsel combined have considerable litigation experience, primarily in the area of consumer protection law and have participated in countless complex litigation cases throughout the nation.  Ron Parry, Rob Sparks, Earl Underwood, and David Szwack are all members of NACA.

15

**F.**    **The Substance and Amount of Opposition to the Settlement**

As the Class numbers in excess of 10 million members, it is striking and extremely instructive that only 16 class members served a total of 9 objections.[7] "Such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the settlement." *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (N.D. Ill. 2001). Courts have previously noted that where the percentage of class members who objected to settlements was in the 10% - 15% range, settlement is "strongly favored." *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-119 (3rd Cir. 1990); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979). In the instant matter, the percentage of objectors amounts to .00016 of a percent of the total Class members. This vanishingly small number demonstrates beyond argument that the Settlement has met the approval of virtually the entire Class. Moreover, it should not be forgotten that "all class members had the opportunity to opt out of the settlement and preserve their right to independently seek full recovery of their alleged damages if they believed that they could achieve a better result." *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 258 (D. Del. 2002).

The 9 objections themselves are indeed inherently suspect, as counsel for the objectors, including the *pro se* attorney objector, routinely file objections to class actions

---

[7]    No objector provided a factual basis establishing that they are members of the Class. The parties were unable to determine whether a number of the objectors are actually members of the Class as they do not allege that they received a Notice, nor do they provide identifying information about themselves. Those individuals include Theresa Martin, of the Schweinberg objectors and Kristopher Harris, William Welch and Ronald Watkins, of the Harris objectors.

throughout the country.  Various objector counsel have attempted repeatedly to block Class

Counsels' attempts to confirm the objector class members' knowledge of the case and the

basis of their objections.   One deposition of an objector taken to date likely provides a

window into their counsels' concern.  Napoleon Davis was deposed by Earl Underwood, an

attorney representing the Class.   Ex. E  Mr. Davis testified that he did not read the entire

Notice.  Davis Depo. 17:5-15; 37:9-17.  He explained that he did not understand the portion

of the Notice that he read and contacted an attorney he knows for assistance.  Davis Depo.

17:5-17.  Mr. Davis was referred to Mr. Hutsler, the attorney who filed the objection on Mr.

Davis' behalf.  Davis Depo 16:13-21.  Mr. Davis testified that he is a current Progressive

policyholder.  Davis Depo 13:18-21; 24:14-16.  Mr. Davis further testified that he did not

know that the settlement provided for premium reductions and premium refunds if inaccurate

information in his credit report, corrected through the Settlement, would qualify him for a

lower premium.  Davis Depo 35:3-18.   As Mr. Davis did not read the Notice and is not

familiar with the relief available to the Class members, it is difficult to believe that the

objections launched on his behalf are his own.[8]   *See* Davis Depo. 32:17-23; 33:1-16.

Depositions of other objectors revealed similarly detrimental evidence of the lack of good

faith in the objections made.

      The few objections, with little or no explanation or analysis, argue that the Settlement

_____

[8]      It is also interesting to note that although the objections launched are not
publically available, Mr. Pentz, counsel for the Bells, appeared at Mr. Davis'
deposition.  Davis Depo. 5; 4:21.

17

is unfair because it only gives Class members that to which the Class members are already entitled.  Not only does this argument sorely understate the full benefits of the settlement, it also misses the point entirely.  Giving Class members "what they're entitled to" was the very purpose of the lawsuit.  It is precisely because the Settlement starts by giving Class members that which they were previously deprived of which makes the Settlement fair and reasonable.

Evan Hendricks, a recognized expert on privacy matters and the FCRA[9], states in his affidavit in support of this settlement:

> 25.    Thus, an important value in the Settlement is the notice to class members. In effect, this notice serves as a surrogate adverse action notice, advising class members that they experienced an adverse action in relation to their application for Progressive insurance because of information in their credit report. Accordingly, the settlement notice paves the way for class members for the first time to become fully informed (1) in regards to their transaction with Progressive, and (2) that negative information in their credit reports was the cause of them either being quoted a higher rate or being denied altogether.

Mr. Hendricks is one of very few experts with extensive knowledge of the FCRA and the newly revised FACT Act.  His passion for consumers' rights is evident from even a cursory review of his attached Affidavit.

The objectors argue that the FCRA provides for statutory remedies for violations of the FCRA in the range of $100 to $1,000.  What each objector fails to note, however, is that such statutory relief is available only upon a showing by Plaintiffs that Progressive *willfully*

---

[9]Mr. Hendricks has been certified as an expert in federal courts and has testified about consumer matters before Congress on numerous occasions.  Hendricks Affidavit ¶¶ 3, 6, 7.

violated the FCRA.  As discussed more fully above, this is a hotly contested issue in this litigation.  Armchair objector counsel may ignore this, but Class counsel, who have fought this battle for four years, recognize the inherent difficulty in proving such a high level of culpability against a defendant accused not of failing or refusing to have any FCRA adverse action notice procedures whatsoever, but instead of having arguably flawed procedures.

The objectors all argue that the settlement only gives to Class members that to which they were already entitled, but all ignore the plain fact that the Settlement attempts to restore to Class members exactly those rights previously denied them. Although the exact data which may have led to adverse action in the past is no longer available to consumers, it is possible to let Class members see their current reports free of charge and allow current policyholders to determine whether existing mistakes in their current reports are resulting in higher premiums at this time. Obviously, only Class members are in a position to determine whether there are mistakes in their credit reports. Contrary to the suggestion of objectors, the fact that the consumer reporting agency Experian is not a party to this litigation provides *additional* protection to Class members. Experian must initiate specific statutory procedures to investigate and resolve reported mistakes in credit reports, as brought to its attention by Class members. 15 U.S.C. § 1681i.  Because Experian is specifically not included as a party to this settlement, Class members retain all enforcement rights against Experian with regard to these required procedures to which they are entitled. In other words, Experian still has to perform its full statutory obligations and is not protected by the terms of this Settlement.

Additionally, all objectors completely gloss over the important benefit provided to existing policyholders to reduce their premiums and obtain a credit or refund for past premiums if in fact mistakes in their current reports are contributing to higher premiums. The dollar value of this benefit has not been included in the overall value of the Settlement benefits by the valuation expert Evan Hendricks because any number would be speculative. The value to each Class member of having received adverse action notice, together with access to a new credit report is more than sufficient standing on its own to justify the fairness and adequacy of this settlement. Premium reductions and refunds represent, however, untold bonus value to class members.

Objectors also uniformly and completely ignore the Settlement benefits resulting from changes in Progressive's FCRA compliance procedures as set forth in the Settlement Agreement. These changes will significantly alter Progressive's FCRA procedures and provide more complete information to Class members and all future Progressive policyholders with regard to the effect consumer reports have on their premiums. Thus, at no expense to the Federal Trade Commission[10] or taxpayers, Progressive has altered its procedures in furtherance of the objectives of the FCRA. Indeed, the changes agreed to by Progressive are not even uniformly recognized at this time by the courts as necessary under the Act. *See Marks, supra.*. In obtaining this Agreement with Progressive to improve its compliance procedures, Plaintiffs have bestowed a valuable benefit not only on current Class

---

[10]The FTC is charged with enforcement of the FCRA.  15 U.S.C. § 1681s.

20

members, but also on the millions of future Progressive policyholders who will reap the benefit of this Settlement term.

The majority of the objectors contend that opportunities to receive credit reports at no cost to Class members have no value whatsoever, and that the Class members thus receive nothing in this Settlement. Aside from ignoring the remaining benefits of the Settlement, this argument is also completely without merit.[11]  Objectors' counsel assume erroneously that Class members have no need for more than one credit report a year. They blithely ignore the advice of everyone in the consumer protection industry that - given the ubiquitous use of credit reports in adversely affecting consumers, the day-to-day changes in the contents of such reports, and the rising threat of identity theft - consumers should avail themselves of every opportunity to review their credit reports. If objectors' counsel truly want to advise all Class members that they have no use for a free credit report through this Settlement, which report is available *in addition to* any other credit report that might otherwise be available throughout any given year, they should be prepared to explain to consumer advocates everywhere and to the FTC their utter lack of concern for the safety of consumers, not to mention the class on behalf of whom they purport to have concerns.

Similarly, objectors refer to the new amendments enacted by Congress, the FACT Act, which beginning at various times next year, will require consumer reporting agencies

---

[11]In *Clark v. Experian, et al.*, a class settlement was approved in which class members received entitlement to a free credit report. The Court found that this provision of the settlement provided real benefit to the class.  Ex. F

to provide a free credit report upon request. Not only is this provision not implemented at this time, a fact objectors conveniently ignore, but even when it is implemented, the credit report made available to Class members in this settlement is *in addition to* any other such report, another fact likewise ignored by objectors. Hendricks Affidavit ¶¶ 20, 21.  When Congress passed the new law, it most decidedly did not eliminate the other existing requirements for the availability of free credit reports for consumers already contained in the FCRA (adverse action notices, identity theft, etc.). Since Congress and the FTC believe that additional available credit reports retain their full value, this Court should likewise find that the Settlement benefit provided for in this settlement retains its full value in today's consumer world and comports entirely with the letter and the spirit of the federal legislation that formed the basis of the claims in this action.  In addition, there is all the difference in the world between Class members being told through individual notice and through national publication that, as Class members against whom adverse action was taken, they are entitled to a current free credit report, and an inchoate future right pursuant to a federal statute about which they most likely have no knowledge.  Hendricks Affidavit ¶ 23.

One objector, Dawn Wheelahan, a *pro se* attorney class member, has complained about the scope of the release herein. She alleges that certain of her cases involving impermissible use of credit reports would have been released by this Settlement had they been against Progressive (which they are not).  A simple reading of the release language, however, demonstrates that only Progressive's use of consumer reports in underwriting and rating insurance policies are affected, not Progressive's use of credit reports for any

22

impermissible purpose.  As is evident from a review of the FCRA, the underwriting of insurance is an enumerated permissible purpose for the use of credit reports.  The objection is not well-taken.

Objectors attack the sufficiency of the mailed and published notices to the Class alleging that the Notice was required to contain directions to the Class about how to object. The exact language of these notices was, however, reviewed and approved by the Court in connection with the preliminary approval and fully complies with Rule 23.  The settlement agreement provided for individual mailed notices, for publication notices in national publications, and for access via the internet to complete and full information regarding the Settlement.  The parties also provided toll-free telephone numbers to the Class members so that members of the Class had literally unlimited access to Class Counsel and to the Claims Administrator. Objectors, all of whom timely filed their objections, argue that the mailed and published notices should have set forth objection deadlines.  The objectors, however, uniformly fail to note that the notices direct Class members to a website containing a complete copy of the Settlement Agreement together with the order of preliminary approval. The Settlement Agreement and the order of preliminary approval each contain detailed language with regard to such deadlines.  The website also contains answers to frequently asked questions, and directs Class members to a separate website run by Class Counsel for the benefit of the Class members.  The Class Counsel website contains yet more information regarding objections to the settlement.  Upon a complete review of the expansive amount of

information available to the Class members, it is clear that the Class members have been fully advised of their rights.

Rule 23(c)(2)(B), Federal Rules of Civil Procedure, governs the requirements of class notices. The Rule specifically states that the notice "must contain and clearly state in plain, easily understood language" six items of information, including the fact that "a class member may enter an appearance through counsel if the member so desires." The notices approved by this Court contain the following:

> The interests of Class Members will be represented by Lead Counsel at the Fairness Hearing except for those Class Members that choose to appear individually or through counsel of their own choosing.

Thus, contrary to the baseless assertions of the objectors, the notices herein conformed completely to the requirements of Rule 23, and advised all class members of their right to appear through their own counsel and not be represented by class counsel herein. Moreover, the legislature revisited Rule 23 as recently as last year. It is well-settled that the Notice to class members is merely a summary of the settlement agreement at issue. The parties in the instant case created a Notice that comports with Rule 23 *and* made the entire Settlement Agreement readily available to the entire Class. The 16 objectors herein exercised that right and their objections have been heard by the Court. Their complaints regarding the Notices not only ignore the facts, they ignore the law.

The few objectors who bother to cite any authority in their objections rely upon *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) for the proposition that the Notice to the Class was inadequate. *Phillips* simply does not stand for the proposition that class notice

24

must include a delineation of the procedures for propounding an objection. A plain reading of that case shows that the court merely stated that *opt out* requirements be spelled out in the class notice, and that Class members generally must be afforded an opportunity to speak to the proposed settlement. The notice approved by the Court herein fully complies with the *Shutts* opinion, as well as Rule 23.

The objection filed for Harris, Welch and Watkins, who may or may not be Class members, alleges that the Notice procedure approved by this Court does not comport with due process requirements because not every Class member received a mailed Notice.  Rule 23 requires that reasonable efforts are taken to send mailed Notice to the class.  As detailed in Sheila Brown's Affidavit (filed under separate cover), reasonable efforts were taken to identify the addresses of members of the Class.  Additionally, as is more fully set forth above, Notice was published in such a manner that Notice of this Settlement reached over 60 million consumers.  Pines Affidavit (filed under separate cover) Under any analysis, the comprehensive efforts taken in this case to notify the Class of their rights under the Settlement were entirely reasonable.

Finally, several of the objectors argue that the $4.5 million Plaintiffs will seek from the Court to be paid by Progressive for attorneys fees and costs is unreasonable.  This argument is simply without merit.  To begin, the Court will rule separately on Plaintiffs' Motion for Award of Attorneys Fees and Costs.  Additionally, Progressive will pay Plaintiffs' and Class members' attorneys fees in addition to the other benefits conferred upon the Class through the Settlement.  The bench mark in the Eleventh Circuit for attorneys fees

in the class action context is 25% of the value of the recovery for the class.  *Camden I, supra* at 774.  As previously stated, the value of the benefits conferred upon the Class in this Settlement are approximately $110.5 million.  Thus the $4.5 million fee Plaintiffs will request totals less than 4% of the value of the benefit to the Class.

      **G.**     **The Stage of the Proceedings at Which the Settlement Was Achieved**

      The protracted nature of the litigation in the case at bar is a matter of record.  The Settlement Agreement presented to this Court for final approval arrives after nearly four years of zealous and ardent litigation.  Plaintiffs have filed, among other things, a complaint, an amended complaint, two motions for partial summary judgment and a motion for class certification.  Voluminous documents have been exchanged and numerous depositions have been taken and defended.  The Settlement Agreement was reached only after Plaintiffs filed their second motion for summary judgment and their motion for class certification.  Additionally, Defendants filed a cross-motion for summary judgment and had vigorously opposed Plaintiffs' motion for class certification.  Moreover, cases from various parts of the country, some litigated extensively in their original jurisdiction, were transferred to this Court by the Panel on Multidistrict Litigation.  Only at the eleventh hour did the parties reach an agreement, thus avoiding the possibility that one or the other side to this litigation might suffer an adverse ruling from the Court on the pending motions for summary judgment and motion for class certification.

**III.**    **THE SETTLEMENT IS NOT THE RESULT OF FRAUD OR COLLUSION**

      The lengthy and vigorous litigation witnessed by this Court thus evidences the lack

of collusion in the compromise settlement ultimately reached by the parties.  As more fully set forth above, the Court had before it competing motions for summary judgment and a motion for class certification fully briefed when the parties reached the settlement agreement through protracted arms-length negotiations.  Further evidence of the absence of collusion is the fact that the matter of attorneys' fees was not discussed until the parties had agreed to all other aspects of the Settlement. Smiljanich Affidavit ¶¶ 52, 53.  The attorneys fees are to be paid by Progressive separate and apart from the benefits conferred upon the Class.  Therefore, there existed no moment when the interests of the parties were aligned against the Class.  As stated by the United States District Court in the Northern District of Georgia, "The conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is reason to believe otherwise."  *In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, 313 (N.D. Ga. 1993).  There is no reason to believe that the Settlement before this Court is a result of collusion.  This is quite simply because the facts themselves demonstrate beyond cavil no such collusion.

## IV.  CONCLUSION

The Court has overseen the litigation of this action for nearly four years, including the consolidation of five separate lawsuits.  The Settlement before this Court effects changes in federal compliance procedures to one of the largest insurers in the nation.  Additionally, the compromise Settlement provides benefits to more than 10 million consumers, virtually all of whom did not even know that they had potential claims against Progressive for alleged violations of the FCRA.  Moreover, the Settlement provides benefits that replicate, to the

27

extent possible, the very benefits Plaintiffs alleged the Class was originally denied. Plaintiffs respectfully request this Court exercise its discretion and find that this Settlement is fair reasonable and adequate, and enter final judgment in accord with the Settlement Agreement previously preliminarily approved.

Respectfully submitted,

JAMES, HOYER, NEWCOMER &
 SMILJANICH, P.A.

*/s/ Terry A. Smiljanich*
Terry A. Smiljanich
Florida Bar No. 145359
Kathleen Clark Ford
Florida Bar No. 047120
4830 W. Kennedy Blvd., Suite 550
Tampa, FL 33609
Telephone: (813) 286-4100
Facsimile:  (813) 286-4174

**Class Counsel**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been served upon the following by filing electronically and via e-mail this 26th day of October, 2004:

Barry Richard
Glenn Burhans
GREENBERG TRAURIG, P.A.
101 E. College Avenue
PO Drawer 1838
Tallahassee, FL 32302

*/s/ Terry A. Smiljanich*
TERRY A. SMILJANICH

28